BRUCE M. PORTER AND ESTATE OF ESTELLE A. PORTER, BRUCE M. PORTER, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Porter v. Commissioner
Docket No. 20201-83.
United States Tax Court
T.C. Memo 1986-208; 1986 Tax Ct. Memo LEXIS 400; 51 T.C.M. (CCH) 1062; T.C.M. (RIA) 86208; May 22, 1986. *400 Held: Addition to tax for fraud found against wife but not against husband. Fraud cannot be predicated upon actual or imputed knowledge of facts which, if investigated, would have led to a disclosure of understatement of income on joint tax returns. Sanford Zisman, for the petitioners. Mark H. Howard, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies and additions to tax under section 6653(b) against petitioners for *401 the years and the amounts as follows: Addition to Tax
Calendar Year
Deficiencies
Section 6653(b) [1]
1974
$10,384.68
$5,192.34
1975
5,806.06
2,903.03
1976
10,201.73
5,100.87
1977
15,575.78
7,787.89
1978
23,874.11
11,937.06
1979
21,492.83
10,746.42
Due to concessions and stipulations, the first issue for decision is whether in each of the years in issue each petitioner [2] is subject to the addition to tax for fraud under section 6653(b). If we fail to find the addition to tax for fraud, we will then be required to determine whether any one or more of the tax years 1974 through 1978 is barred by the running of the statute of limitations. We note that the years 1976 through 1978 would be open for assessment under section 6501(e)(1)(A) if the requirements of that subsection are met. For convenience our Findings of Fact and Opinion are combined. *402 Some of the facts have been stipulated and they are so found. At the time they filed their petition in this case, Dr. and Mrs. Porter resided in Fort Collins, Colorado. Dr. Porter is a medical doctor, specializing in obsterics and gynecology. He had practiced medicine for a number of years prior to the years involved in this case. Dr. and Mrs. Porter had been married for many years prior to the period of time here involved. Mrs. Porter had had a medical problem for which she had been hospitalized on a number of occasions but for the period from 1964 through 1980 that problem appeared to be solved. [3] In 1974, Dr. Porter suffered a heart attack.He was unable to practice for several months during the year, and when he resumed his medical practice he undertook to reduce his work load. Mrs. Porter had long supervised and, in large part, personally handled the bookkeeping for Dr. Porter's medical practice. During the years 1974 through 1979, Mrs. Porter was responsible for and did most of the work involved in assembling the necessary information as to income and expeses for tax return preparation. She delivered or caused such information to be delivered to the partner, Richard *403 F. Spellman, in the firm of independent certified public accountants who acted as tax return preparers for petitioners. Dr. Porter did not like bookkeeping or accounting matters or tax return preparation and left substantially all business matters of this type to Mrs. Porter. Approximately 95 percent of the checks drawn on petitioners' checking account were prepared and signed by Mrs. Porter. However, the books, accounting records, and check book were, of course, always available to Dr. Porter. Dr. and Mrs. Porter had had a long standing difference of opinion as to the use and conservation of money. Dr. Porter had found in earlier years that discussion of financial matters with Mrs. Porter contributed to Mrs. Porter's medical problem; therefore, he had simply ceased to interfere, leaving that side of his business and personal life to Mrs. Porter. However, during the 1974-1979 period, Dr. Porter was generally aware of the medical receipts from his practice including the fact that he received income from Colorado State University Medical Center (CSU). *404 Dr. Porter's medical income came essentially from three distinct sources: his regular obstetric and gynecology practice; thereapeutic abortions; [4] and consulting fees from CSU. In years prior to 1974, the recorded information concerning theraputic abortions was mixed with similar information as to other patients and information as to payments received for all medical services rendered was all disclosed to tax return preparers. However, in 1974, Dr. Porter was advised by legal counsel that he should maintain greater confidentiality with respect to the identity of patients on whom abortions were performed. Starting in 1974, a separate ledger or log was maintained for abortion patients. Based on the advice of the attorney, that particular log was not to be disclosed to tax return preparers. In lieu of disclosure, Dr. Porter directed that each year an adding machine tape should be made showing the income from abortions, which tape should be delivered to the tax return preparers instead of the log. The basic bookkeeping record maintained in Dr. Porter's *405 office during this period of time was the appointment book which included very brief information as to the medical services performed as well as charges and payments for services. [5] On petitioners' books, therapeutic abortions are consistently indicated by the initials "TA." From the appointment book, daily log books were kept for the regular medical practice and for the abortions, and entries were made in these log books as soon as feasible after the entries had been made in the appointment book. In addition, a cash receipt book was maintained, as were copies of deposit slips to the personal bank account of petitioners, which was also used for the medical practice. Consulting fees received from CSU were generally not recorded in either a daily log book or the appointment book. [6]
All monies received from the medical practice, including the abortions and the consulting fees, were deposited in petitioners' *406 bank account. Mrs. Porter was very careful to account for and deposit all cash receipts. It was Mrs. Porter's practice to reflect on the deposit tickets the identity of the patient from whom the payment was received. The return preparers received canceled checks (or copies thereof), adding machine tapes showing gross receipts, and the cash receipt journal. In some cases, the checks would be segregated into categories of expenses. The parties have stipulated the amounts of gross income received by petitioners for each of the years before the Court as well as the lesser amounts reported on their income tax returns. The following table shows by categories the income from medical services received and as reported. [7]
Regular Practice
Therapeutic Abortion
CSU
Year
Income
Income
Income
1974
Received
$51,013.33
$32,071.00
$3,082.50
Reported
47,648.00
1975
Received
41,148.00
21,474.00
6,692.50
Reported
41,148.00
1976
Received
59,063.70
21,036.80
7,163.75
Reported
51,243.00
1977
Received
65,384.21
35,656.00
8,715.00
Reported
64,767.00
1978
Received
75,646.71
47,930.43
7,946.00
Reported
[8] 65,609.00
4,445.00
1979
Received
58,550.14
69,437.00
6,401.00
Reported
48,624.18
6,401.00
*407 For each of the years 1974 through 1978, inclusive, petitioners omitted between 40 percent and 44 percent of their total income from the medical practice. For the year 1979 approximately 58 percent of this income was not reported. The table also reflects that in none of the years did petitioners report any of the abortion income. In 1978, 56 percent and, in 1979, all CSU income was reported. A portion of the regular practice income was omitted in every year except 1975. It also seems somewhat curious that, according to the return preparer's records, the CSU income for 1979 was reported by Mrs. Porter in a telephone conversation which took place after she had submitted the income records for tax return preparation. [9] Payments to Dr. Porter from CSU were generally made on a monthly basis but occasionally more frequently. For the year 1978 CSU submitted a Form 1099 to Dr. Porter. The record is silent as to whether Forms 1099 from CSU were submitted for other years. *408 The following table shows the net income from Dr. Porter's medical practice as shown by the several Schedules C attached to each of the returns for this 6-year period: Years
Amounts
1974
$5,730 1975
[10] (7,583)
1976
3,935 1977
5,570 1978
2,707 1979
(13,471)
In each of the years, except 1977, the tax return showed no taxable income, and the taxable income for 1977 was a little over $1,000. The return preparers had no contact whatsoever with Dr. Porter until after respondent's audit commenced. Prior to that time there were numerous telephone contacts with Mrs. Porter to inquire as to deductions which were logical but had not been reported, such as charitable contributions, or to clarify matters as to dependency exemptions. In addition, in 1975 after the 1974 tax return had been prepared, and again in 1980 after the 1979 tax return had been prepared, the CPA partner responsible for the Porter business discussed with Mrs. Porter the financial situation of the Porters. In 1975 Mrs. Porter explained that Dr. Porter had been out of the office for a period of time due to his heart attack; hence, income for that year might be less than anticipated. *409 Mrs. Porter explained that the Porters were having a hard time meeting expenses and that they were living a somewhat hand-to-mouth existence.Her response in 1980 was similar. In fact, from time to time there were delays in payment to the return preparers of their fees for services. However, in 1974, the Porters purchased a lot for $10,000 on which they caused a new home to be constructed at a cost in excess of $45,000. Construction was completed early in 1976. The home is hear a country club of which they were members. In 1974 petitioners purchased a small cabin cruiser costing about $14,000. In 1973 an office building was purchased for $35,000. However, the Porters do not appear to have lived extravagantly during this period of time, particularly in light of Dr. Porters' actual income. They seem simply to have "frittered away" their income in miscellaneous ways. There is no evidence that the Porters had accumulated investment assets of any substantial value or concealed accumulated income. Mrs. Porter created the impression on people with whom she worked that she was a highly nervous individual, a constant talker whose thread *410 of conversation changed frequently and abruptly. She did not appear to have had any real bookkeeping or accounting ability or any sophisticated knowledge of income tax accounting but she was intelligent, entirely lucid, and fully capable of assembling for the return preparers the information necessary for them to use in the preparation of an income tax return, including responding to their inquiries as to facts. She understood the need to report income and deductions. This is confirmed by the fact that each of the Schedules C attached to the income tax returns for this period shows considerable factual detail supplied by her. For example, on the 1977 return, the return preparers received sufficiently detailed information to record Mrs. Porter as having received $2,400 in compensation which was apparently included in the gross amount of salaries shown as a deduction on the Schedule C. If anyone had undertaken to reconcile bank deposits with reported income, a substantial discrepancy would have been apparent. Inquiry would have lead to the discovery of substantial unreported income. It was such an analysis performed by one of respondent's agents in 1980 with respect to the year *411 1978 that led to the conclusion that there was substantial underreporting of income on that tax return. When respondent's agent discovered the apparent substantial omission of gross income from the 1978 return, she requested information from the return preparers. The CPA partner and his staff met for the first time with Dr. Porter to discuss the problem. Dr. Porter was extremely upset at this disclosure. He apparently made a reconciliation of deposits with income reported and satisfied himself that there was a substantial understatement of income. Shortly thereafter, he met privately with the CPA partner, at which meeting the partner agreed that the return preparers shared some of the responsibility for not becoming aware of the underreporting of income. There was also some overstating of expenses. For example, some of Mrs. Porter's beauty parlor expenses were claimed as medical office expenses. We conclude that Mrs. Porter intentionally failed to disclose to the return preparers all of the income received by Dr. Porter from therapeutic abortions and portions of the income received from CSU and understated income from the regular medical practice, well knowing that such items *412 of income would be omitted from the tax returns prepared for each of the years in issue. Thus, Mrs. Porter signed such tax returns and caused them to be filed with the Internal Revenue Service, knowing that substantial amounts of gross income were omitted therefrom, and that the tax returns were false and fraudulent. In contrast, Dr. Porter was not aware at the time he signed any of the tax returns for the years 1974 through 1979 that substantial amounts of gross income had been omitted from the returns by reason of Mrs. Porter's actions. However, at least with respect to the tax return for the year 1976 and thereafter, including especially the tax return for the year 1979, Dr. Porter knew or should have realized that each tax return showed either a loss or negligible income. He also knew that the Porters' standard of living had not been reduced in any material respect. Hence, Dr. Porter had facts in his possession which should have caused him to inquire; if he had inquired or independently had made a reconciliation between deposits and reported income, which he was capable of doing, he would have discovered the apparent failure to report substantial amounts of income. Under *413 section 6653(b) respondent has the burden of proof by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. ; . The existence of fraud is a question of fact to be resolved upon consideration of the entire record. , affd. without published opinion ; . Fraud is not to be imputed or presumed. ; . However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. ; *414 (1969). The intent to conceal or mislead may be inferred from the pattern of conduct. See . A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See ; However, the mere failure to report income is not sufficient to establish fraud. . And fraud may not be found under "circumstances which at most create only suspicion." . We have carefully considered the medical evidence submitted by petitioners in this case as it bears upon the ability of Mrs. Porter to comprehend that she was causing false and fraudulent Federal income tax returns to be filed and the consequences thereof. We are convinced that the medical problem which she had had prior to 1964 and which reoccurred during the year *415 1980 had no bearing upon the actions of Mrs. Porter. The testimony is unequivocal that her medical problem was under control during the years 1974 through 1979, inclusive; that during this period she was lucid, fully capable of performing the bookkeeping work which she undertook, and the gathering and reporting of facts to the return preparers. While she was not a trained bookkeeper, she fully understood the necessity to provide the return preparers with accurate figures for both gross income and deductions. She is bound to have known that the income from therapeutic abortions as well as from CSU should have been reported to the return preparers so as to be included in gross income reported on the income tax returns, as had been done in prior years. The omissions from income are too significant to have resulted from mere carelessness. She demonstrated that in 1979 she could accurately report the entire CSU income upon request. The income for year 1978 could have been at least as easily reported since a Form 1099 was received. We, of course, have no direct proof of Mrs. Porter's intent. Since she could not testify at trial, we are unable to form any judgment as to her credibility *416 as a witness. Nonetheless, the circumstantial evidence in this case is more than adequate to support our findings. Her failure to disclose the income from therapeutic abortions and her false responses to the CPA partner as to the financial situation of the Porters, continued over the 6-year period, convinces us that she caused the underreporting of income with an intent to conceal and that she signed the income tax returns for each of the years in issue well knowing that each of them was false and fraudulent. While it is possible that she may have feared reduced earnings by Dr. Porter following his heart attack, his earnings from 1976 through 1979, the amount of which she had readily at hand, substantially exceed the two prior years.The consistent pattern of underreporting is too significant to be excused. We, therefore, find against the Estate of Mrs. Porter and for respondent on the addition to tax under section 6653(b). The circumstances with respect to Dr. Porter are entirely different. We are convinced that Dr. Porter had no actual knowledge of the falsity of any of the tax returns for this 6-year period until the facts were disclosed to him by the return preparers in 1980. *417 Dr. Porter did have information available to him which should have caused him to inquire; however, he made no such inquiry. Whether this was due entirely or in part to the friction he experienced with Mrs. Porter in the past over money matters, we cannot determine. However, mere suspicion or knowledge of facts which should have caused an inquiry is not sufficient to discharge respondent's burden of proof. Cf. ;. We simply cannot find fraud against Dr. Porter on this record. Respondent, with obvious understanding of the possibility of our finding lack of knowledge of the fraud in Dr. Porter, argues that "intentional ignorance by Dr. Porter in this case should not constitute a bar" to a finding of fraud against him. For this proposition, respondent relies upon , cert. denied . Katz does not help respondent here. While the taxpayers in Katz may not have had knowledge of the exact amounts of the understatements of income, the Court held that the jury was *418 warranted in finding that all defendants knew their full incomes were not disclosed. In that circumstance, the Court of Appeals noted that "Innocence cannot out-distance ignorance." . But there remains a difference between actual knowledge and imputed knowledge. We simply cannot on this record find that Dr. Porter had actual knowledge of underreporting. [11] Mere suspicion will not suffice. Accordingly, as to the fraud addition, we find for Dr. Porter and against respondent. We are thus brought to the statute of limitations issue. Each of these returns was a joint return and since we have found fraud against Mrs. Porter, one of the signatories to each of the returns, each of the years is open for assessment by respondent. , affg. on this issue a Memorandum Opinion of this Court. Thus, although petitioner has conceded on brief that all of the years other than 1974 *419 and 1975 are open due to the 6-year statute of limitations, we need not further discuss that issue since all years are open for assessment by reason of fraud. We also note that petitioners conceded at the commencement of the trial that Dr. Porter is not relying on section 6013(e)(1). Decision will be entered for respondent on the deficiencies in tax. Decision will be entered for respondent as to the Estate of Estelle A. Porter, Bruce M. Porter, Personal Representative, with respect to the additions to tax for fraud and for petitioner Bruce M. Porter with respect to the additions to tax for fraud.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Mrs. Porter died after the petition in this case was filed. By order dated June 8, 1984, the caption of the case was amended to substitute Mrs. Porter's Estate, Bruce M. Porter, Personal Representative, for Mrs. Porter.↩
3. At the request of Dr. Porter and with the consent of respondent, certain medical testimony and records have been sealed. For that reason, our description of these matters in the opinion is necessarily generalized. Since we find that Mrs. Porter's medical problems are entirely irrelevant to the issues to be decided, no more specific discussion is required.↩
4. The parties are in agreement that therapeutic abortions during the period involved were legal under the laws of Colorado.↩
5. Many patients paid cash at the time the services were rendered. ↩
6. The former receptionist-bookkeeper testified that CSU fees were recorded in the daily log. The parties have stipulated to the contrary which we accept as more accurate than this witness's recollection.↩
7. For convenience we have omitted other income such as interest and state tax refunds. We also note that in every year the stipulated business income is in excess of that determined in the statutory notice. However, respondent has not claimed increased deficiencies. ↩
8. The stipulation explains why this figure differs from that in the statutory notice. ↩
9. It was the practice of the return preparers to routinely question taxpayers when information received in one year omitted apparently routine income or deductions reported for the prior year. We note that for some unexplained reason some income from CSU had been reported for 1978. Therefore, it seems probable that a telephone inquiry from the return preparers caused Mrs. Porter to report to them the correct CSU income for 1979.↩
10. Parenthesis indicate a minus figure.↩
11. It is at least possible that interrogation of Dr. Porter on the basis of a cash flow analysis might have provided a basis for a finding of actual knowledge, but respondent did not attempt that here.↩